Evelyn V. Keyes, Justice *396 In this case involving former business associates, Manisch Sohani and Anis Virani sued Nizar Sunesara for fraud and sought a declaratory judgment that Sunesara was not a member of three limited liability companies formed to manage the business of three retail shops that sold tobacco products and smoking accessories. Sunesara sought a declaration that he was a member of all three limited liability companies (collectively, the LLCs) and that he was entitled to one-third of the profits from the LLCs. After a jury trial, the jury found that Sunesara was a member of the LLCs and was entitled to one-third of the profits from the LLCs. The jury also found that Sohani and Virani were estopped from denying that Sunesara was a member of the LLCs and that Sunesara did not commit fraud against Sohani and Virani. The trial court entered a final judgment declaring that Sunesara was a member of the LLCs and was entitled to one-third of the profits from the LLCs. The trial court also awarded Sunesara trial and conditional appellate attorney's fees, court costs, and post-judgment interest.
In three issues on appeal, Sohani and Virani contend that (1) the trial court's judgment conflicts with Business Organizations Code section 101.201, which requires that profits and losses of a limited liability company be allocated to each member based on the agreed value of the member's contributions "as stated in the company's records," and none of the LLCs here had a written record of Sunesara's alleged contributions; (2) the trial court erroneously admitted documents that Sunesara disclosed less than thirty days before trial; and (3) the trial court lacked subject matter jurisdiction because Sunesara sought damages in excess of the jurisdictional limits of the county civil court at law.
We modify the judgment of the trial court and affirm as modified.
Background
A. Initial Acquisition of Three Smoke Shops
The parties to this case have known each other for nearly two decades. Sunesara and Virani are cousins, and Sunesara met Sohani through a fraternity at the University of Houston and later introduced him to Virani. The three men decided to go into business together, and this dispute arises out of that relationship.
In 2002, Sunesara and Virani started selling smoking accessories and devices in flea markets in Houston and Austin on the weekends. Sunesara used his own funds to purchase inventory, and Virani contributed his time. Sohani, who owned a "general merchandise wholesale" business, was not involved in running the flea market shop, although he was one of their vendors. After having success with the flea markets, in 2003, Sunesara and Virani decided to start a brick-and-mortar retail shop selling smoking accessories in Houston seven days per week. They called this business Zig Zag Smoke Shop. Sohani, along with several other vendors, contributed inventory on credit to Zig Zag. Virani acted as the general manager of Zig Zag. Virani testified that he and Sunesara offered Sohani a portion of the ownership of Zig Zag, and *397 they agreed to split profits in thirds.[1]
In 2007 or 2008, Sunesara transitioned away from a daily focus on Zig Zag when Sohani offered him a sales and marketing position at his company, Mike's Worldwide Imports ("MWI"). Sunesara eventually became the chief financial officer of MWI. Virani also took a position in sales and marketing at MWI, but he continued managing the day-to-day operations at Zig Zag while he worked at MWI. At the time of trial, Virani was the chief financial officer of MWI.
In 2012, Zig Zag was doing well, and Sunesara and Virani decided that they wanted to expand their business, so they found a second retail location. Sunesara and Virani called this store Burn Smoke Shop ("Burn I"). Sunesara testified that he contributed $10,000 in cash for the startup of Burn I, and he gave this money to Virani. He stated that no records of this contribution exist and that he did not ask Virani for a receipt or documentation. Sunesara testified that he also contributed "deferred profits," which he explained as an agreement among himself, Virani, and Sohani that they would obtain the inventory for Burn I from MWI and "that inventory would be paid back before we took out any profits from the business."
Virani testified that Sunesara did not contribute anything to Burn I. He testified that Burn I acquired all of the fixtures in the shop from a company on credit and that Sohani, via MWI, contributed the inventory. Virani disagreed that Sunesara ever gave him $10,000 in cash or that he contributed "deferred profits" because all of the profits from the shops went to Sohani to cover the inventory that he had contributed. Sohani testified that he provided inventory to Burn I, but he did not want to be otherwise involved with that shop.
Toward the end of 2012, another retail smoke shop decided to sell its existing business, called EZ Smoke Shop, and Sunesara, Virani, and Sohani agreed to purchase this business. They then changed the name to Burn Smoke Shop Two ("Burn II"). Sunesara testified that he contributed $10,000 in cash to the acquisition of this business and deferred profits. He stated that, as with Burn I, he gave the cash to Virani, and he did not receive a receipt or any kind of documentation concerning this contribution. Sunesara testified that Virani contributed $10,000 in cash and became the manager of Burn II, while Sohani contributed inventory from MWI and assumed a personal guarantee for the purchase price of the shop, which was between $80,000 and $100,000.
Virani testified that Sohani had another customer who owned a retail shop, who wanted to leave the industry, and who owed Sohani money, so Sohani and this other individual worked out a deal in which Sohani purchased the ongoing business and forgave some of the debt that the other person owed to him. Virani testified that Sunesara's only involvement in the acquisition of Burn II was that he wrote some of the checks on behalf of MWI to the prior owner of the shop. Sohani agreed with Virani that Sunesara did not contribute anything to the three shops. Virani stated that his contribution to the smoke shops was his time and effort in organizing the shops, getting them ready for business, and overseeing the day-to-day operations. Sohani testified that, with regard to Zig Zag and Burn I, in addition to contributing inventory from MWI, he also made arrangements *398 with the shops' other vendors to assume around $40,000 to $50,000 in debt that the shops owed.
SSV Corporation, which Sunesara incorporated in 2007, owned the assets of both Zig Zag and Burn I. It never owned the assets of Burn II. Sunesara and Virani both owned fifty percent of SSV Corporation. The trial court admitted a spreadsheet-Defendant's Exhibit 17-which purported to be a yearly cash flow statement that Virani prepared for SSV Corporation in 2011. This document reflected that monthly "profits/commissions" were paid to various people, including equal amounts to Virani, Sohani, and Sunesara. Sunesara testified that, although Sohani was not a formal owner of SSV Corporation, everyone "still considered him a partner" and he "was still a part of the company," which is why he received profit distributions from SSV Corporation. Sunesara also testified that Virani handled the profit distributions and that he would deliver the cash distributions to Sunesara and Sohani each month.
B. Creation of the LLCs
Before the parties finalized the acquisition of Burn II, Sohani and Virani asked Sunesara to file paperwork with the Texas Secretary of State to form three limited liability companies to own and run the three smoke shops. Sunesara completed and filed Certificates of Formation for the LLCs: ZZSS, LLC, which managed Zig Zag Smoke Shop; BRNSS, LLC, which managed Burn I; and EZSS, LLC, which managed Burn II. Each of the Certificates of Formation listed Virani, Sohani, and Sunesara as governing persons of the LLCs. Sunesara testified that he showed each of the certificates to Virani prior to filing, and Virani authorized the filing of the documents. He stated that he did not show the certificates to Sohani but that Sohani had given him authorization to file the certificates. Sunesara's signature is on each of the three certificates, but neither Virani nor Sohani signed the certificates.
Shortly after the creation of the LLCs, Virani sought to open a bank account for each of the LLCs with Chase Bank. Several days after Virani initially made this inquiry, he, Sohani, and Sunesara all went to a branch of Chase Bank, and each of them signed a signature card for each of the three LLCs. Virani and Sohani were present when Sunesara signed the signature cards. Each signature card listed Virani, Sohani, and Sunesara as a "Member." The "Business Depository Resolution" for each of the three accounts included a certification by the signatories that the business is "a limited liability company organized under the laws of the state/country of USA and the individuals signing this Resolution constitute all of the members or managers, as appropriate[,] of the company." This document, like the signature cards, listed Virani, Sunesara, and Sohani as a "Member." Each of the three men signed this document under a heading stating, "For Limited Liability Company (all members/managers must sign)[.]" Sunesara testified that the bank required a copy of the Certificate of Formation for the LLCs before it would open the accounts and that Virani provided the certificates to the bank.
Virani testified that Sohani had the idea to set up the LLCs in order to insulate each smoke shop from the others. Neither Virani nor Sohani had any experience in forming entities, so they asked Sunesara if he would complete the paperwork. Sohani testified that he told Sunesara that Sohani and Virani would be the owners of the LLCs. Virani disputed Sunesara's testimony that he showed Virani the Certificates of Formation for the LLCs prior to filing them with the Secretary of State. He testified *399 that Sohani had authorized Sunesara to file the paperwork, but Sunesara should not have been listed as a member of the any of the LLCs. Instead, according to Virani's and Sohani's testimony, the only members listed on the Certificates of Formation should have been Virani and Sohani. Virani testified that the LLCs began operating in early 2013, and before that, SSV Corporation was operating Zig Zag and Burn I.
Virani also testified that Sohani asked Sunesara to set up the bank accounts for each of the LLCs. Virani stated that he "inquire[d] about a bank account," but his only involvement in setting up the accounts was signing the signature cards and the depository resolutions. He testified that he noticed Sunesara's name on the account documents, but this did not concern him because Sunesara was also listed on the accounts for MWI.
The trial court admitted copies of the LLCs' franchise tax public information reports from 2013 and 2014. The reports from 2013 listed Virani, Sunesara, and Sohani as members, and Virani's name was typed in the box that said "Sign Here." The reports from 2014 listed only Virani and Sohani as members and reflected Virani's handwritten signature. The 2013 and 2014 federal income tax returns for the LLCs stated that Virani and Sohani each owned 50% of the LLCs.
Virani testified that he never received a profit distribution from the LLCs because the profits went to MWI to pay back the inventory that Sohani contributed, as well as to the other creditors and vendors of the LLCs. Sohani testified similarly that profits from the LLCs have been used to pay for the inventory that MWI contributed, but he has not personally received any profit distributions.
C. Deterioration of the Parties' Relationship
In June 2012, after the parties had started Burn I but before they had acquired Burn II, federal law enforcement officers began conducting nationwide raids on retailers, wholesalers, and distributors in the smoke shop industry, targeting sellers of synthetic marijuana. Sunesara became concerned because this was a product that MWI and the retail shops were selling. Sunesara testified that he approached Sohani to discuss the issue, and he suggested that both MWI and the retail shops move away from selling this product. Sunesara told Sohani that he would quit if they did not stop selling this product, and his understanding was that the retail shops did stop selling it. He stated that he did not tell Virani and Sohani that he wanted to "give up any part of [his] ownership in the retail stores."
Federal law enforcement raided MWI in June 2013. Officers questioned Sunesara, but he was not charged with any offense. Sunesara immediately took a leave of absence from MWI, and he testified that he never asked for his job back and he never went back to work at MWI.[2] Sohani testified that Sunesara later asked for his job back, but Sohani refused because Sunesara "left [him] in the most critical time."
*400 Virani testified that after the raid on MWI, in July 2013, he and Sohani realized that they did not have important documentation for the LLCs, such as operating agreements. After Virani conducted some internet research, he and Sohani drafted and signed form operating agreements for each of the LLCs. The signature page of the identical operating agreements, entitled "Certification of Members," lists only Virani and Sohani as members of the LLCs and states, under each of their names: "Made 50% of contributions, Owns 50% of profits and assets." Sunesara's name is not included in any of the three operating agreements, and he had no involvement in drafting the agreements.
Sunesara testified that he received monthly profit distributions from the LLCs for the first five months of 2013. He testified that, after he took a leave of absence from MWI, he regularly asked Virani "what the situation was with the profit distributions." He stated that Virani gave him excuses regarding why there were no profit distributions, and then the parties ceased communicating in October 2013.
In November 2014, Virani and Sohani received a letter from Sunesara's attorney stating that Sunesara "wanted a share of his business" and was claiming an ownership interest in the LLCs, but, according to Virani, Sunesara "had no share in the business." Later, Virani and Sohani tried to open a bank account at a new bank, but they were told they could not do so because they needed Sunesara's authorization and signature as well. The LLCs also attempted to obtain a loan to pay back a portion of the debt owed to Sohani and MWI, but the bank would not issue the loan because it needed the signatures of the three people listed as members on the Certificates of Formation, which included Sunesara.
D. Procedural Background
Sohani and Virani initially filed suit against Sunesara in February 2015 in the Harris County Civil Court at Law Number One. Sohani and Virani asserted a cause of action for fraud, alleging that Sunesara improperly listed himself as a member of the LLCs on the Certificates of Formation and that he fraudulently represented that he was a member of the LLCs entitled to profit distributions and access to the books and records of the LLCs. Sohani and Virani also sought declarations that Sunesara was not a member of the LLCs, Sunesara did not have a membership interest in the LLCs, Sunesara was not entitled to review the books and records of the LLCs, and Sunesara was not entitled to any profit distributions or other sums from the LLCs.
Sunesara answered and filed several counterclaims against Sohani and Virani, including claims for breach of fiduciary duty, breach of the duty of good faith and fair dealing, an accounting, quantum meruit, fraud, and promissory estoppel. Sunesara also sought a declaration that he was a member of the LLCs and was entitled to one-third of the profits from the LLCs. As affirmative defenses to Sohani and Virani's claims, Sunesara asserted fraud and that Sohani and Virani were estopped from denying his membership in the LLCs.
Approximately one month before trial, on January 15, 2016, Sohani and Virani filed a motion in limine, in which they requested that Sunesara approach the trial court outside the presence of the jury and seek a ruling on the admissibility of several categories of evidence, including any evidence that Sunesara failed to produce during the discovery period or failed to supplement in response to Sohani and Virani's discovery requests and any documents first produced by Sunesara less *401 than thirty days before the trial date. The trial court discussed this motion on the record before the trial started and denied this request.
Sunesara subsequently moved for leave to file amended discovery responses. In this motion, Sunesara's counsel stated that counsel had served several documents on Sohani and Virani's counsel on January 11, 2016. Due to clerical errors, Sunesara's amended responses to Sohani and Virani's requests for production were not served until January 12, 2016, less than thirty days before trial was set to start. Sunesara requested leave to file these responses, arguing that the documents "were either prepared by Plaintiffs or at one time had been in their files" and therefore would not result in unfair surprise or prejudice. The record does not include a written or oral objection to this request. The trial court granted this motion, finding that there was good cause for the filing and the filing did not unfairly surprise or prejudice Sohani and Virani.
On February 15, 2016, the day before trial started, Sunesara filed an amended answer and counterclaim. Sunesara dropped his claims seeking monetary damages from Sohani and Virani,[3] and instead solely sought non-monetary relief in the form of a declaratory judgment that he was a member of the LLCs, that he was entitled to one-third of the net profits of the LLCs, and that he was entitled to examine the books and records of the LLCs.
Question Number One of the jury charge asked whether Sunesara was a member of ZZSS, LLC entitled to one-third profit distribution at the time ZZSS, LLC was formed. Questions Number Two and Three were identical to Question One, but referred to BRNSS, LLC and EZSS, LLC, respectively. The charge did not include any accompanying definitions or instructions for these questions. The jury answered "yes" to all three of these questions. Question Number Four asked whether Sohani and Virani were estopped from denying that Sunesara was a member of the LLCs, and the jury answered "yes" to this question. In Questions Number Five and Seven, the jury found that Sunesara did not commit fraud against Virani and Sohani. The jury also made findings concerning the trial-level attorney's fees for the parties.
Following the jury's verdict but before the trial court entered final judgment, Sohani and Virani moved to dismiss the action for lack of subject-matter jurisdiction. Sohani and Virani argued that Sunesara, in his amended counterclaim in which he sought solely declaratory relief, had failed to "identify or allege the value of the 'matter in controversy.' " Sohani and Virani also argued that Sunesara had presented them with a document containing calculations regarding the net profits of each of the LLCs, and they argued that this document demonstrated that the one-third of the profits from each of the LLCs, combined, totaled more than $200,000, which is the upper limit for a county court at law to exercise jurisdiction.
Sohani and Virani also moved for judgment notwithstanding the verdict (JNOV). Sohani and Virani argued that Sunesara presented only his self-serving testimony that he was a member of the LLCs and had made contributions to the LLCs, but he did not present any evidence of a written or oral agreement entitling him to membership and one-third of the profits of the LLCs. As support, Sohani and Virani cited Business Organizations Code section 101.201, which provides that profits and *402 losses of a limited liability company "shall be allocated to each member of the company on the basis of the agreed value of the contributions made by each member, as stated in the company's records." Sohani and Virani argued that, even if Sunesara made contributions to the LLCs, he failed to present any evidence that his contributions entitled him to one-third of the profits of the LLCs.
The trial court did not rule on either of Sohani and Virani's post-verdict motions. The trial court entered final judgment in favor of Sunesara, declaring that Sunesara was a member of the LLCs and entitled to one-third of the profits from the LLCs. The trial court also awarded Sunesara trial-level and conditional appellate attorney's fees, court costs, and post-judgment interest.
Sohani and Virani then filed a motion for new trial. In this motion, supported by the declaration of their counsel, they argued that a new trial was warranted because the trial court erred by failing to exclude documents that Sunesara had not timely disclosed. Sohani and Virani argued that a large percentage of the total documents disclosed by Sunesara during discovery were disclosed less than thirty days before the scheduled trial date. They argued that the trial court's denial of their motion in limine and the admission of these documents at trial violated Texas Rules of Civil Procedure 193.5 and 193.6. The trial court denied Sohani and Virani's motion for new trial. This appeal followed.
Subject-Matter Jurisdiction
In their third issue, Sohani and Virani contend that the trial court lacked subject-matter jurisdiction because Sunesara sought damages, in the form of a one-third share of the LLCs' net profits, in an amount that exceeded the jurisdictional limits of the county civil court at law.
A. Standard of Review and Governing Law
Subject-matter jurisdiction is essential to the authority of a court to decide a case. Bland Indep. Sch. Dist. v. Blue , 34 S.W.3d 547, 553-54 (Tex. 2000) ; see also In re United Servs. Auto. Ass'n , 307 S.W.3d 299, 309 (Tex. 2010) ("A judgment is void if rendered by a court without subject matter jurisdiction."). Subject-matter jurisdiction cannot be waived or conferred by agreement, and it may be raised at any point during the proceeding. Anderson v. Truelove , 446 S.W.3d 87, 91 (Tex. App.-Houston [1st Dist.] 2014, no pet.) (quoting Rusk State Hosp. v. Black , 392 S.W.3d 88, 103 (Tex. 2012) ). The pleader must allege facts that affirmatively demonstrate the trial court's jurisdiction to hear the case. Id. Whether subject-matter jurisdiction exists is a question of law that we review de novo. City of Houston v. Rhule , 417 S.W.3d 440, 442 (Tex. 2013) (per curiam).
Texas state district courts are courts of "general jurisdiction," and a presumption exists that courts of general jurisdiction have subject-matter jurisdiction unless a contrary showing is made. Dubai Petroleum Co. v. Kazi , 12 S.W.3d 71, 75 (Tex. 2000). County courts at law, however, are courts of "limited jurisdiction." United Servs. Auto. Ass'n v. Brite , 215 S.W.3d 400, 401 (Tex. 2007) ; Garrett Operators, Inc. v. City of Houston , 360 S.W.3d 36, 44 (Tex. App.-Houston [1st Dist.] 2011, pet. denied). Jurisdiction in county courts at law is not presumed, and therefore "the authority to adjudicate the claims presented must be established at the outset of the case." Abdullatif v. Erpile, LLC , 460 S.W.3d 685, 691 (Tex. App.-Houston [14th Dist.] 2015, no pet.) (citing Dubai Petroleum , 12 S.W.3d at 75 ).
"Declaratory judgment actions are not generally within the jurisdiction of *403 Harris County civil courts at law, absent some proof that the subject matter of the declaratory judgment action is one within the court's jurisdictional limits." Garrett Operators , 360 S.W.3d at 44. The Uniform Declaratory Judgment Act does not itself confer jurisdiction or extend a trial court's jurisdiction. Tex. Nat. Res. Conservation Comm'n v. IT-Davy , 74 S.W.3d 849, 855 (Tex. 2002) ; Garrett Operators , 360 S.W.3d at 44.
Texas Government Code section 25.0003, which is generally applicable to county courts at law, provides that a statutory county court "has jurisdiction over all causes and proceedings, civil and criminal, original and appellate, prescribed by law for county courts." TEX. GOV'T CODE ANN . § 25.0003(a) (West Supp. 2017). Under this section, a statutory county court exercising concurrent jurisdiction "with the constitutional jurisdiction of the county court has concurrent jurisdiction with the district court" in civil cases "in which the matter in controversy exceeds $500 but does not exceed $200,000 ... as alleged on the face of the petition." Id. § 25.0003(c)(1). "The jurisdictional statute for county courts at law values the matter in controversy on the amount of damages 'alleged' by the plaintiff, not on the amount the plaintiff is likely to recover." Brite , 215 S.W.3d at 402-03 ; Tune v. Tex. Dep't of Pub. Safety , 23 S.W.3d 358, 361 (Tex. 2000) ("It has long been the law that the phrase 'amount in controversy,' in the jurisdictional context, means 'the sum of money or the value of the thing originally sued for....' ") (emphasis in original); Eris v. Giannakopoulos , 369 S.W.3d 618, 622 (Tex. App.-Houston [1st Dist.] 2012, pet. dism'd) ("To determine the amount in controversy, courts of appeals generally look to the allegations in the plaintiff's petition.").
Government Code section 25.1032 contains provisions specific to the Harris County Civil Courts at Law, in which this case originated. It provides, "A county civil court at law in Harris County has jurisdiction over all civil matters and causes, original and appellate, prescribed by law for county courts, but does not have the jurisdiction of a probate court." TEX. GOV'T CODE ANN . § 25.1032(a) (West Supp. 2017). It further provides, "In addition to other jurisdiction provided by law," the Harris County Civil Courts at Law have jurisdiction to "decide the issue of title to real or personal property." Id. § 25.1032(d)(1) ; see also id. § 25.0001(a) (West 2004) (providing that if general provision relating to all statutory county courts conflicts with specific provision for particular court or county, specific provision controls). This section "bases the county civil courts' jurisdiction on the type of claim, not the amount of money in dispute." AIC Mgmt. v. Crews , 246 S.W.3d 640, 644 (Tex. 2008) (construing Government Code section 25.1032(c)(1), which was later renumbered to 25.1032(d)(1)). The Harris County Civil Courts at Law have jurisdiction to decide issues of title "in addition to their general concurrent jurisdiction described in section 25.0003(c) and is not dependent upon the amount in controversy." Id.
Business Organizations Code section 101.106(a), at issue here, provides that "[a] membership interest in a limited liability company is personal property." TEX. BUS. ORGS. CODE ANN . § 101.106(a) (West 2012); Spates v. Office of Att'y Gen., Child Support Div. , 485 S.W.3d 546, 552 (Tex. App.-Houston [14th Dist.] 2016, no pet.). A membership interest of a limited liability company includes a "member's share of profits and losses or similar items and the right to receive distributions." TEX. BUS. ORGS. CODE ANN . § 1.002(54) (West Supp. 2017). Because the Harris County Civil Courts at Law have the authority to decide *404 the issue of title to personal property, these courts have jurisdiction to determine whether a party is the rightful owner of a membership interest in a limited liability company. See Abdullatif , 460 S.W.3d at 695 (holding that Harris County civil courts at law have jurisdiction to determine whether person is rightful owner of membership interest in limited liability company because this is "issue of title to personal property," which is within jurisdiction of these courts).
B. Analysis
Here, all of the parties sought declaratory relief concerning Sunesara's status as a member of the LLCs. Sohani and Virani sought a declaration that Sunesara was not a member of the LLCs. Sunesara responded and sought a declaration that he was the rightful owner of a membership interest in the LLCs. Sunesara also sought a declaration that he was entitled to one-third of the profits from the LLCs. A membership interest in a limited liability company is personal property, and this interest includes a "member's share of profits and losses or similar items and the right to receive distributions." See TEX. BUS. ORGS. CODE ANN . § 101.106(a) ; id. § 1.002(54) (defining "membership interest"). The Harris County Civil Courts at Law have jurisdiction to determine issues relating to title to real and personal property; therefore, the trial court here had subject-matter jurisdiction to determine whether Sunesara was a member of the LLCs and whether he was entitled to profits from the LLCs. See TEX. GOV'T CODE ANN . § 25.1032(d)(1) ; TEX. BUS. ORGS. CODE ANN . § 101.106(a) ; AIC Mgmt. , 246 S.W.3d at 644 ; Abdullatif , 460 S.W.3d at 695.
We overrule Sohani and Virani's third issue.
Requirement that Contributions to LLCs be Memorialized in Writing
In their first issue, Sohani and Virani contend that the trial court's judgment, which declared that Sunesara was a member of each of the LLCs and was entitled to one-third of the profits from each of the LLCs, conflicts with Business Organizations Code section 101.201, which requires an LLC's allocation of profits and losses to be made "on the basis of the agreed value of the contributions made by each member, as stated in the company's records." Sohani and Virani contend that no written record exists demonstrating Sunesara's contributions to the LLCs or demonstrating that he is entitled to one-third of the profits.
A. Relevant Provisions of Business Organizations Code
The Texas Business Organizations Code defines "member," in the context of a limited liability company, as "a person who is a member or has been admitted as a member in the limited liability company under its governing documents." TEX. BUS. ORGS. CODE ANN . § 1.002(53)(A) ; id. § 1.002(36)(A) (defining "governing documents" for domestic entity to be "the certificate of formation for a domestic filing entity" and "the other documents or agreements adopted by the entity under [the Business Organizations Code] to govern the formation or the internal affairs of the entity"). The Code defines "membership interest" as "a member's interest in an entity" and then further clarifies that "[w]ith respect to a limited liability company, the term includes a member's share of profits and losses or similar items and the right to receive distributions, but does not include a member's right to participate in management." Id. § 1.002(54).
*405 Business Organizations Code Section 101.001, which is specific to limited liability companies, defines "company agreement" as "any agreement, written or oral, of the members concerning the affairs or the conduct of the business of a limited liability company." Id. § 101.001(1) (West 2012). Section 101.102(b) provides that "[a] person is not required, as a condition to becoming a member of or acquiring a membership interest in a limited liability company, to ... make a contribution to the company." Id. § 101.102(b)(1) (West 2012); see id. § 1.002(9) (defining "contribution" as "a tangible or intangible benefit that a person transfers to an entity in consideration for an ownership interest in the entity or otherwise in the person's capacity as an owner or member" and including "cash, services rendered, a contract for services to be performed, a promissory note or other obligation of a person to pay cash or transfer property to the entity, or securities or other interests in or obligations of an entity").
Section 101.201 provides, "The profits and losses of a limited liability company shall be allocated to each member of the company on the basis of the agreed value of the contributions made by each member, as stated in the company's records required under Section 101.501. " Id. § 101.201 (West 2012) (emphasis added); id. § 101.203 (West 2012) ("Distributions of cash and other assets of a limited liability company shall be made to each member of the company according to the agreed value of the member's contribution to the company as stated in the company's records required under Sections 3.151 and 101.501.") (emphasis added). Section 3.151(a) provides that each filing entity, including limited liability companies, shall keep "books and records of accounts," "minutes of the proceedings of the owners or members," "a current record of the name and mailing address of each owner or member of the filing entity," and "other books and records as required by the title of [the Business Organizations Code] governing the entity." Id. § 3.151(a) (West 2012).
Section 101.501, specific to limited liability companies, sets out particular records that limited liability companies are required to keep at their principal place of business, including a written statement of "the amount of a cash contribution and a description and statement of the agreed value of any other contribution made or agreed to be made by each member." Id. § 101.501(a)(7) (West 2012). The books and records may be in "written paper form or another form capable of being converted into written paper form within a reasonable time." Id. § 3.151(b). "Each owner or member of a filing entity may examine the books and records of the filing entity maintained under Section 3.151 and other books and records of the filing entity to the extent provided by the governing documents of the entity and the title of [the Business Organizations Code] governing the filing entity." Id. § 3.153 (West 2012); id. § 101.502(a) (West 2012) (providing right of member of limited liability company to examine and copy records company is required to keep).
B. Preservation of Error
Sunesara contends that Sohani and Virani failed to preserve for appellate review their complaint that no written record exists demonstrating Sunesara's contributions to the LLCs or demonstrating that he is entitled to one-third of the profits because they did not object to the jury charge and they did not move for a directed verdict.
A trial court may disregard a jury verdict and render judgment notwithstanding the verdict if a directed verdict *406 would have been proper. TEX. R. CIV. P. 301 ; Bruce v. Cauthen , 515 S.W.3d 495, 507 (Tex. App.-Houston [14th Dist.] 2017, pet. denied). A directed verdict is proper when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. Lake v. Cravens , 488 S.W.3d 867, 899 n.43 (Tex. App.-Fort Worth 2016, no pet.). To preserve a no evidence or matter of law point for appeal, a party must raise the complaint through a motion for directed verdict, a motion for JNOV, an objection to the submission of the question in the jury charge, a motion to disregard the jury's answer to a vital fact question, or a motion for new trial. Damian v. Bell Helicopter Textron, Inc. , 352 S.W.3d 124, 141 (Tex. App.-Fort Worth 2011, pet. denied) ; United Parcel Serv., Inc. v. Tasdemiroglu , 25 S.W.3d 914, 916 (Tex. App.-Houston [14th Dist.] 2000, pet. denied).
Here, the jury determined that Sunesara was a member of the LLCs and entitled to one-third of the profits from each of the LLCs. Sohani and Virani moved for JNOV, asserting that the evidence conclusively negated Sunesara's right to a judgment declaring him entitled to one-third of the profits of the LLCs. They argued that Sunesara failed to present any evidence that the books and records of the LLCs showed that he was entitled to one-third of the profits, as required by Business Organizations code section 101.201 to establish a right to profits. Sohani and Virani thus presented a legal argument that would negate Sunesara's right to a declaration that he was entitled to one-third of the profits of the LLCs. SeeLake , 488 S.W.3d at 899 n.43. By raising this argument in a motion for JNOV, Sohani and Virani properly preserved this complaint for appellate review. See Damian , 352 S.W.3d at 141 ; Tasdemiroglu , 25 S.W.3d at 916. We therefore turn to the merits of Sohani and Virani's first issue.
C. Analysis
Sohani and Virani's issue requires us to construe sections 101.201 and 101.501 of the Business Organizations Code. When construing a statute, we look to the statute's plain language in order to give effect to the Legislature's intent. Lippincott v. Whisenhunt , 462 S.W.3d 507, 509 (Tex. 2015) (per curiam). "We presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted." Id. We may not "judicially amend a statute by adding words that are not contained in the language of the statute." Id. at 508.
At trial, Sunesara testified that he made contributions to the LLCs. Specifically, he testified that he contributed $10,000 in cash and "deferred profits" to the startup of Burn I and the acquisition of Burn II. Sunesara, however, presented no documentary evidence reflecting the contributions that he made to the LLCs. The appellate record contains no writing setting out the specific contributions made by any of the three members or stating that Sunesara is entitled to one-third of the profits from the LLCs. The company agreements for each of the LLCs, admitted into evidence, instead list only Sohani and Virani as members and state, under each of their names, "Made 50% of contributions, Owns 50% of profits and assets." Sunesara is not mentioned in these documents.
As stated above, Business Organizations Code section 101.201 provides, "The profits and losses of a limited liability company shall be allocated to each member of the company on the basis of the agreed value of the contributions made by each member, as stated in the company's records required under Section 101.501. " TEX. BUS. ORGS. CODE ANN . § 101.201 (emphasis added). Section 101.501, in turn, lists several *407 particular items that limited liability companies are required to maintain in their records, including a written statement of "the amount of a cash contribution and a description and statement of the agreed value of any other contribution made or agreed to be made by each member."[4] Id. § 101.501(a)(7).
We construe these sections as requiring a limited liability company to include a statement of the amount of cash contributions made by each member and a statement of the agreed value of any other contribution made by each member in the written records of the company and that these records establish the allocation of a member's share of the profits and losses of the company. Because Sunesara did not introduce any records of the LLCs reflecting the contributions that he made to the LLCs, we conclude that he has presented no evidence that he is entitled to one-third of the profits of the LLCs under section 101.201.
Sunesara argues that his testimony that he made contributions to the LLCs should suffice to demonstrate his entitlement to one-third of the profits of the LLCs. However, the plain language of section 101.201 requires that profits and losses be allocated on the basis of the agreed value of the contributions made by each member, as stated in the company's records required under Section 101.501, and the plain language of section 101.501 requires a limited liability company to maintain a written record of the amount of a cash contribution and a description and statement of the agreed value of any other contribution made or agreed to be made by each member. See id. §§ 101.201, 101.501(a)(7). Accepting Sunesara's argument that his oral testimony that he made contributions to the LLCs establishes his entitlement to one-third of the profits of the LLCs, in the absence of any written evidence or records of the LLCs demonstrating his contributions, would be contrary to the plain language of both section 101.201, see id. § 101.201, and section 101.501(a)(7), see id. § 101.501(a)(7). See Lippincott , 462 S.W.3d at 509.
Sunesara further points to the 2008 tax return of MNA Corporation-which stated that Sunesara, Virani, and Sohani were each allocated one-third of the profits for that corporation-and the records of SSV Corporation-which stated that Sunesara and Virani each owned fifty percent of that corporation-and argues that, when the LLCs were created and took over operation of the smoke shops, these records became a part of the records for the LLCs, thus satisfying the writing requirement of section 101.201.
MNA Corporation, SSV Corporation, and the LLCs are all separate and distinct entities, and Sunesara cites no law for the proposition that when the LLCs began operating the smoke shops-the former assets of MNA Corporation and SSV Corporation-all of the records from the earlier-formed entities became records of the new LLCs. The documentary evidence reflecting that Sunesara had a one-third ownership interest in MNA Corporation and a one-half interest in SSV Corporation, thus entitling him to profit distributions from those entities establish just *408 that: that he was entitled to distributions from MNA Corporation and SSV Corporation. These records do not establish that he made contributions to the LLCs or that he was entitled to one-third of the profits from the LLCs.
We therefore hold that the trial court erred to the extent that it ruled that Sunesara was entitled to one-third of the profits from each of the LLCs. See TEX. BUS. ORGS. CODE ANN . § 101.201. Because Sunesara was not assigned a share of profits in the company agreements and presented no evidence that he was entitled to a one-third share of profits in the LLCs, he was not entitled to a share in profits as a matter of law. We therefore modify the judgment of the trial court accordingly.
We sustain Sohani and Virani's first issue.[5]
Admission of Untimely Disclosed Documents
In their second issue, Sohani and Virani contend that the trial court erred in admitting documents that Sunesara disclosed to them within thirty days before trial. Specifically, Sohani and Virani complain about the admission of three of Sunesara's exhibits: (1) Exhibit 21, an e-mail from Sunesara to Virani dated March 6, 2012; (2) Exhibit 8, a letter from the Internal Revenue Service concerning BRNSS, LLC's electing to be taxed as an S-Corporation; and (3) Exhibit 17, a spreadsheet documenting the yearly cash-flow statements for SSV Corporation in 2011.
A. Timely Disclosure During Discovery
No later than thirty days before the end of the discovery period, a party may serve on another party a request for production of documents within the scope of discovery. TEX. R. CIV. P. 196.1(a). The responding party must serve a written response to the request within thirty days after service of the request. TEX. R. CIV. P. 196.2(a). If a party learns that his response to written discovery was incomplete or incorrect when made, the party must amend or supplement the response. TEX. R. CIV. P. 193.5(a). The party must make an amended or supplemental response "reasonably promptly after the party discovers the necessity for such a response," and it is presumed that an amended or supplemental response made less than thirty days before trial was not made reasonable promptly. TEX. R. CIV. P. 193.5(b).
A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed unless the trial court finds that:
(1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or
(2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.
TEX. R. CIV. P. 193.6(a). The party seeking to introduce the evidence bears the burden of establishing good cause or the lack of unfair surprise or prejudice, and the record must support a finding of good cause or the lack of unfair surprise or prejudice. TEX. R. CIV. P. 193.6(b).
B. Preservation of Error
Generally, to preserve a complaint for appellate review, the record must demonstrate that the party made the complaint to the trial court by timely request, objection, *409 or motion that stated the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a)(1)(A). A party complaining that the opposing party failed to timely disclose documents in response to discovery requests-and thus seeking exclusion of those documents pursuant to Rule 193.6-must bring this complaint to the trial court's attention by the time the opposing party offers the allegedly untimely disclosed documents into evidence. See Petroleum Workers Union of the Republic of Mex. v. Gomez , 503 S.W.3d 9, 35-36 (Tex. App.-Houston [14th Dist.] 2016, no pet.) (holding that appellant failed to timely object to witness's testimony on topic that was not timely disclosed during discovery period when appellant did not object at time of testimony but instead waited six days before moving for mistrial based on testimony); Kheir v. Progressive Cnty. Mut. Ins. Co. , No. 14-04-00694-CV, 2006 WL 1594031, at *8 (Tex. App.-Houston [14th Dist.] June 13, 2006, pet. denied) (mem. op.) (holding that appellant failed to preserve error concerning admission of evidence in violation of Rule 193.6 when appellant did not object on this basis at time evidence was offered but instead raised complaint in motion for directed verdict after all evidence was introduced).
Here, Sunesara sought leave from the trial court to file amended discovery responses twenty-nine days before trial was scheduled to start. On the first day of trial, Sunesara brought up this motion and, with little discussion, the trial court granted the motion. The record contains no written or oral objection by Sohani and Virani to this request from Sunesara. Sohani and Virani filed a motion in limine concerning documents produced by Sunesara less than thirty days before trial, however, the trial court denied this request. Furthermore, it is well-established that a motion in limine itself preserves nothing for appellate review. In re BCH Dev., LLC , 525 S.W.3d 920, 925 (Tex. App.-Dallas 2017, orig. proceeding). Instead, to preserve error, the party must object at the time the evidence is offered. Greenberg Traurig of N.Y., P.C. v. Moody , 161 S.W.3d 56, 91 (Tex. App.-Houston [14th Dist.] 2004, no pet.) ("Because a trial court's ruling on a motion in limine preserves nothing for review, a party must object at trial when the testimony is offered to preserve error for appellate review.").
Sohani and Virani specifically complain about the admission of three allegedly untimely disclosed exhibits on appeal. Exhibit 21, an e-mail from Sunesara to Virani, was pre-admitted without objection. Sunesara also offered Exhibit 8, a letter from the Internal Revenue Service to BRNSS, LLC notifying BRNSS that the IRS had accepted its election to be treated as an S-Corporation for the 2013 tax year. Sohani and Virani's counsel stated "[n]o objection" at the time Sunesara offered this exhibit. Finally, with respect to Exhibit 17, a spreadsheet reflecting the yearly cash flow statements for SSV Corporation for 2011, the following exchange occurred when Sunesara offered the exhibit:
[Sunesara]: Your Honor, at this time, we would offer Defendant's Exhibit 17 into evidence.
(Defense Exhibit No. 17 Offered)
[Sohani and Virani]: Your Honor, I have a slight objection, if we may approach.
The Court: I'm sorry?
[Sohani and Virani]: If we may approach?
The Court: Yes, sir.
(At the Bench, off the record)
(Open court, parties and jury present)
[Sunesara]: Your Honor, is Defendant's Exhibit 17 admitted into evidence?
*410 The Court: I'm going to admit D-17 into evidence.
Although the record indicates that Sohani and Virani objected to Exhibit 17, the record does not contain the basis for this objection, which was discussed at a bench conference off the record. The record therefore does not reflect whether Sohani and Virani objected to Exhibit 17 on the basis that it should have been excluded because Sunesara did not timely disclose it during discovery. See Brookshire Bros., Inc. v. Wagnon , 979 S.W.2d 343, 348 (Tex. App.-Tyler 1998, pet. denied) (holding that appellant failed to preserve complaint concerning admission of testimony when trial court held bench conference on objection that was not on record); see also Katy Springs & Mfg., Inc. v. Favalora , 476 S.W.3d 579, 611-12 (Tex. App.-Houston [14th Dist.] 2015, pet. denied) ("To preserve error for appeal, the argument made below must match the argument made on appeal."). We cannot conclude from the record before us that Sohani and Virani objected to these three exhibits on the basis that Sunesara did not timely disclose the exhibits until their motion for new trial.
We conclude that because Sohani and Virani did not object to Exhibits 8 and 21 at the times Sunesara offered these exhibits, because the basis for their objection to Exhibit 17 was not stated on the record, and because they waited to object to these three exhibits on the basis of the alleged untimeliness of their disclosure until a motion for new trial, Sohani and Virani did not preserve their complaint that the trial court erroneously admitted these three exhibits for appellate review. See TEX. R. APP. P. 33.1(a) ; Gomez , 503 S.W.3d at 35-36.
We overrule Sohani and Virani's second issue.
Conclusion
We modify the portion of the trial court's judgment stating that Sunesara is entitled to one-third of the profits from the operation of ZZSS, LLC, EZSS, LLC, and BRNSS, LLC. We affirm the judgment as modified.

Sunesara testified that he created a corporation called MNA Corporation to run Zig Zag. Sunesara, Virani, and Sohani each had a one-third ownership interest in MNA Corporation, and Sunesara testified that profits of Zig Zag were distributed in cash to each of the owners on a monthly basis.

Virani testified that Sunesara decided to give up his ownership interest in the retail shops in June or July of 2012, right after the first set of raids, and before the parties acquired Burn II, but he was still working for MWI until June or July of 2013. Sohani agreed with Virani that Sunesara "wasn't part of the business anymore" at the time of the purchase of Burn II. Sunesara, however, denied that he stopped being involved with the smoke shops after the first set of raids in mid-2012 or that he gave up his ownership interest.

Sunesara refiled these claims for monetary relief in the Harris County District Courts.

Section 101.501(b) provides that a limited liability company is not required to keep a written statement of the amount of cash contributions or a statement of the agreed value of other contributions "if that information is stated in a written company agreement." Tex. Bus. Orgs. Code Ann . § 101.501(b) (West 2012). The written company agreements for the LLCs entered into the record in this case do not mention Sunesara, but instead state that Sohani and Virani each made fifty percent of the contributions and own fifty percent of the profits and assets.

Sohani and Virani do not challenge the portion of the trial court's judgment finding that Sunesara is a member of the LLCs.