**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00379-CV**
_____

**LARONDA ZUROVEC, JEREMY CHAFFIN AND COLLABORATIVE SERVICES, LLC, Appellants**

**V.**

**NEHEMIAS RUEBEN, Appellee**

**On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 21-10-14352-CV**

**MEMORANDUM OPINION**

Appellee Nehemias Rueben sued Appellants Laronda Zurovec, Jeremy Chaffin, and Collaborative Services, LLC (CS) asserting multiple causes of action.[1] Rueben sought equitable relief prohibiting Appellants from transferring certain

---

[1]In his Verified First Amended Petition, Rueben also named Collaborative Generators and Power Solutions LLC, Joshua Paninski, Justin Dahlberg, Rebecca Dahlberg, and Michael Shane Guest as defendants, but they are not parties to this appeal.

1

property or assets to a new entity Zurovec and Chaffin formed with other individuals, Collaborative Generators and Power Solutions, LLC (CGPS), including a temporary injunction, which the trial court granted. In this interlocutory appeal, Appellants raise six issues challenging the trial court's temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (permitting interlocutory appeal of grant or denial of temporary injunction). We hold that, while the trial court did not abuse its discretion in granting a temporary injunction to preserve the status quo, it abused its discretion in crafting the temporary injunction order. We declare the temporary injunction order void and dissolve the order since it is overly broad and fails to comply with Texas Rule of Civil Procedure 683. *See* Tex. R. Civ. P. 683.

## I. Background

### A. Parties' Relationship and CS Formation

Rueben, an electrician by trade, and Chaffin, an instrument technician, met in 2012 while working on an oil rig. At the end of 2018, the two of them and Chaffin's wife, Zurovec, discussed starting a new business and splitting everything fifty-fifty. In early 2019, Zurovec filed a dba (doing business as) form with Montgomery County and began operating CS, which provided electrical services and specialized in generator installation in Houston and the surrounding areas. In approximately March of 2019, Rueben began working as a project manager for CS. In October

2019, Zurovec filed a Certificate of Formation with the Texas Secretary of State for CS. The Certificate of Formation listed Zurovec as the sole managing member.

In 2019, Rueben received a 1099 from CS showing total payments of $14,000. In 2020, Rueben received a W-2 from CS, which showed he received a salary of $59,000, and in May 2021, Rueben received a raise, which increased his salary to $9,000 per month. In October 2021, CS severed its relationship with Rueben. According to Zurovec and Chaffin, Rueben began causing problems on jobs, behaving erratically, and was using drugs, so they terminated his at-will employment with CS.

Rueben argues he made multiple monetary contributions to CS, the parties agreed prior to CS's formation they were going into business together and would split everything down the middle, and he owned an interest in the business. Zurovec and Chaffin countered that Rueben's monetary contributions to the company were loans, which were repayable on demand, and in consideration for these loans, he received an increased salary in 2021. There was no written documentation memorializing the terms of these loans.

On September 30, 2021, a Certificate of Formation was filed with the Texas Secretary of State for CGPS, naming Zurovec, Chaffin, Rebecca Dahlberg, Justin Dahlberg, Josh Paninski, and Michael Guest as managing members. CGPS provides similar services as CS but serves an expanding market in North Texas. On October

3

2, 2021, Rueben received a text message from Chaffin notifying him they were going to part ways with him. On October 5, 2021, Rueben filed a Certificate of Formation for Mr. Watts Electrical naming himself and Stacy Doll as managing members. Mr. Watts provides electrical and generator installation services in the Houston area like the services CS provides.

## B. Rueben's Claims

Rueben pleaded causes of action for breach of contract, fraud, breach of fiduciary duty, conspiracy, conversion, and he also filed claims based on promissory estoppel, quantum meruit, unjust enrichment, specific performance, and he asked for a declaratory judgment.[2] In his claim seeking a declaratory judgment, Rueben asked the court to determine the rights of the parties based on their oral partnership agreement, and he asked the court to declare that Zurovec and Chaffin had breached the partnership agreement. Rueben also sought a temporary and permanent injunction. Rueben supported his First Amended Petition with a verification. He also attached CGPS's Certificate of Formation, a copy of CGPS's Facebook page, and CS's Certificate of Formation as exhibits.

---

[2]In his Verified Second Amended Petition filed the night before the temporary injunction hearing, Rueben included claims for fraudulent inducement, fraudulent concealment, and alter ego against Zurovec and CS.

4

## C. Temporary Injunction Hearing and Evidence

At the hearing's outset, Rueben argued that he wanted to enjoin CS from transferring their goods, services, and assets to CGPS. Appellants countered that Rueben is a former employee who started another business, Mr. Watts, that is now a "direct competitor" of CS, and he is trying to prevent CS from expanding its business. Appellants further argued that CGPS was started to service CS customers who have needs outside Montgomery County. Appellants also contended that Rueben was not entitled to a temporary injunction for three reasons, because: money could remedy the harm that resulted from their alleged breach of the alleged agreement; Rueben could not demonstrate he would probably succeed on the merits; and Rueben could not show the parties had reduced the alleged agreement to writing.

### Rueben's Testimony

Rueben testified that he met Chaffin on an oil rig in 2012. Rueben has been an electrician for twenty-five years. Rueben said that before he left his previous employer, he, Zurovec, and Chaffin discussed starting a business together toward the end of 2018. When the three of them had that discussion, they agreed "Hey, let's get together and we'll just split everything down the middle, 50/50." Rueben agreed that they never created a written business plan or formally discussed a business plan or a specific process for their business. Rueben testified that before 2019, Chaffin and Zurovec had never provided electrical services to the public.

5

Rueben explained that he provided operating capital to the business the three of them established. He also testified that he received proceeds from their business. Rueben denied the contributions he made to the business were loans; instead, he said: "I invested." According to Rueben, no one characterized his contributions as loans, terms for the alleged loans were never discussed and he was never provided any documents for any alleged loans.

While Rueben acknowledged he knew a dba filing occurred in Montgomery County for the CS name in early 2019, Chaffin and Zurovec never discussed the filing with Rueben or told him it was Chaffin and Zurovec's company, not his. Over nine months passed between CS's dba filing and the filing of the Certificate of Formation in October 2019. Ruben said that Zurovec and Chaffin never discussed the fact they filed a Certificate of Formation with him. When Rueben learned the LLC paperwork excluded him in May 2020, he spoke to Zurovec and Chaffin and then brought the subject up every couple of months. Ultimately, Rueben said he retained an attorney to help him. After Rueben retained an attorney, the law firm he hired prepared a partnership agreement and questionnaire, which he forwarded to Chaffin and Zurovec. When they responded, they said there were too many legal terms in the documents, and they told Rueben to provide them with documents they could all understand. Rueben testified that Chaffin and Zurovec never told him he would not be a member of CS or they did not believe he would be a good partner.

Rueben said he filed his petition to protect his interest in the company. When asked why he felt the company needed to be restrained, Rueben responded, "Because I accidentally found out that they opened up another company when Rebecca and Justin tagged me on a Facebook post, and then in there, I figured they were going to be running our assets out of that company into the other."

He received a text message from Chaffin on October 2, 2021, which said, "We're making some changes and I think it's best if we just part ways." Rueben testified he spoke to Chaffin the same day or the next day and asked him what was going on, what were they going to do, and told Chaffin they needed to go through the books. Rueben said Chaffin responded that they would go through the books and inventory, and Rueben would get fifty percent of everything. Rueben testified that three days after Chaffin sent the text message, CS sent him a check signed by Zurovec with a memo noting it was a partial return on investment.

Rueben alleged that CS began transferring materials and assets to CGPS at a loss. He provided spreadsheets he prepared with material costs that he said he obtained from CS's vendors.

Zurovec's Testimony

Zurovec testified she is the controller of CS and has a BS in accounting and an MBA. Zurovec testified that CS began in January 2019 as a dba, and in October 2019, she converted it to an LLC. She said that Rueben became involved in CS in

7

February or March 2019 as a project manager and contract employee, and they did not discuss him becoming a member or owner of CS. In October 2019, when she converted CS to an LLC, she did not consider making Rueben a member. Zurovec is the sole member, manager, and owner of CS, and she testified CS's Company Agreement shows her as the sole member.

Zurovec testified Rueben never purchased a membership interest in CS, never received profit distributions from CS, and never made capital contributions to CS, but he loaned CS money. According to Zurovec, when Rueben loaned CS money, it was not for an ownership interest; occasionally, the company had cash flow issues and needed to purchase generators, so he loaned them money for that, and it was understood he would be well compensated. The loan agreements were verbal, and in exchange for the loans, Rueben's compensation increased. CS did not pay interest on the loans. Zurovec explained that when she wrote "return of partial investment" on the check, it was repayment of part of the loans Rueben made to CS. The loans were repayable on demand, and every time Rueben asked for repayment, he was paid. Zurovec testified no written documentation existed on the loans, and CS had no documents to prove the money Rueben provided CS was extended to CS as loans rather than as investments in the company. Zurovec acknowledged that although Rueben sent her an email about expanding his role with the company, she never responded because she did not want him to become an owner.

She explained that Rueben did not have check-writing authority and his name was not on the bank account. She denied Rueben had authority to hire and fire employees. When CS hired Rueben, he was a journeyman electrician, and they tried to help him become a master electrician and paid for him to get that certification, but it never happened. Zurovec testified Rueben was an officer of CS. Zurovec denied that she told Laura Vazquez, CS's insurance agent, Rueben was an owner, but she agreed she might have told Vazquez he was an officer. Zurovec testified that she never represented to the public that Rueben had an ownership interest in the company.

Zurovec testified she was the only employee to receive a K-1 in 2020 and 2021, because she was the only owner of the company. Zurovec testified that Rueben was paid at the same time as other employees, but there may have been a delay paying him once.

Zurovec testified they started CGPS at the very end of September or beginning of October 2021 because some existing customers asked them to install generators in North Texas, but CS did not have the capacity to do that work, so they started a new company. If CS could not serve existing customers in new markets, then they risked losing those customers.

Zurovec disagreed with the cost of materials Rueben provided in his spreadsheets and explained that the generators cost CS about $4500 as opposed to

9

the $6500 Rueben claimed. She denied that CS gave materials to CGPS and explained it would not make sense for her to do so, because CS is 100% hers, and if she gave it away to CGPS, she would lose eighty-five cents on the dollar. She testified that CS has been or will be compensated for anything transferred to CGPS, but as of the hearing date, CGPS had not paid CS for any items transferred to it. She said there were invoices from CS to CGPS, but she was uncertain of the net payout on them.

She agreed that the allegation in Rueben's petition that CS had gross revenues of $1.7 million in 2020 was "close" but was probably closer to $1.5 million. She disagreed that he owned fifty percent, testified that the company never had $1.7 million in inventory, and the most they had was $700,000. She also disputed Rueben's allegation that the company had $1.25 million in paid inventory that had not yet been delivered. Instead, she valued the inventory at around $36,000. Zurovec said that currently, CS is working on eighty projects, and Rueben secured only two of those. According to Zurovec, CS did not have $750,000 in the bank as Rueben alleged; instead, as of September 2021, they had a little over $131,000. Zurovec said that CS has not lost or turned down any contracts since Rueben left. She testified that CS has the capacity to timely handle all its contracts in the Houston area, and they have a journeyman electrician.

Zurovec testified that they terminated Rueben because he stopped responding to customers, became disruptive in the workplace, other employees threatened to quit in response to him, and he became a liability. His behavior began to deteriorate in May or June, shortly after he received his raise.

<u>Chaffin's Testimony</u>

Chaffin testified that he is an account manager who works full-time at CS, but he is not an owner. According to Chaffin, Zurovec is the sole owner of CS and his wife. Chaffin said he does not receive a salary from CS, even though he works there full-time.

Chaffin denied he ever held Rueben out as an owner of CS, but he had heard Rueben refer to himself as an owner in front of clients, customers, and those in their trade. Chaffin agreed that when that occurred, he never corrected Rueben in public or in private.

Rueben expressed an interest in being an owner of CS and sent them an email about it, which he and Rueben discussed the following day. He did not want to be co-owners with Rueben, and Chaffin did not have that authority anyway, because he was not an owner. Chaffin explained he would not want Rueben to be an owner, because Rueben had not filed taxes in several years, there was litigation related to an accident Rueben was involved in with his prior employer, and Rueben was a drug user.

11

Chaffin testified he was unsure exactly how Rueben came to loan CS money, but they traveled together often, and Rueben overheard Chaffin's phone calls asking to borrow capital to purchase generators. In exchange for loaning CS money, Rueben received a raise. Once Rueben's loans to them reached a certain amount, Chaffin approached him about repaying the money. Rueben responded that if he had it back, he would spend it, and leaving it in the company was like having money in the bank. Zurovec also loaned CS money when necessary.

Chaffin testified that Zurovec took a draw from CS to purchase some lots on Barberry street, but when the properties were purchased, the titles were placed in Chaffin's name. The lots were later sold at a profit of around $30,000, which was supposed to split with Rueben. Although the lots were sold around four months before the hearing, Chaffin could not recall exactly how the money was distributed. Chaffin said he was unaware that CS wired Rueben $40,000 within days of selling the lots, but he said that if that happened, he would not be surprised.

Chaffin offered another explanation for sending Ruben $40,000. According to Chaffin, Rueben asked Chaffin for $40,000 so he could bail his brother out of jail. Chaffin said he considered Ruben's request as a request for a return on his investment, so on that basis CS wired Rueben the $40,000 he demanded. Chaffin explained that by "invested," he meant "loaned." Chaffin acknowledged that Rueben provided the company with money, which Chaffin testified the company considered

it owed and planned to pay back, yet that in Chaffin's opinion did not make Rueben an owner. Chaffin testified that there was no deal promised, made, or discussed where the parties agreed that Rueben would own fifty percent of CS.

Chaffin terminated Rueben by text, because he would not answer his phone, which was one of the reasons they fired him. Chaffin described an incident that occurred shortly before they terminated Rueben where Rueben damaged a doctor's home by incorrectly installing a generator because he was high.

Chaffin testified he owns a part of CGPS, but he said the company does not pay him a salary. Chaffin explained they started CGPS to service the Dallas market and to assist their "solar partners" by installing generators. He said that he and Zurovec did not intend to bankrupt CS by starting CGPS, and CGPS intends to pay CS for any materials it obtained from CS.

Rebecca Dahlberg's Testimony

CS's director of sales, Rebecca Dahlberg, testified. She began working for CS in July 2020 and became director of sales in February 2021. Rebecca testified that Rueben was never held out to her as an owner of CS. Rueben expressed his frustration at wanting to be a partner in the company, and they discussed how that worked in the business world. Rebecca testified that Rueben acknowledged to her that he was not an owner, Zurovec was the only owner, but Rueben wanted to become an owner.

13

Rebecca described a situation earlier in the summer where she was riding with Rueben and felt unsafe, because he drove erratically, yelled, and was upset about business dealings. She had observed Rueben drink and smoke marijuana at work, including while driving a car on the job.

As sales director, she had contact with customers and beginning in early summer, she had to salvage customer relationships Rueben damaged. She tried to speak to Rueben about it, but he became angry and told Rebecca she was not doing her job. She testified she considered quitting because of Rueben's on-the-job behavior, which she described as "[c]ompletely inappropriate, being loud, obnoxious, taking over people's computers unnecessarily, you know, smelling like drugs, drinking. I mean, there were countless -- countless times that I had office people coming to me, threatening to quit, due to, like, sexist jokes at work, remarks." Customers also threatened to leave because of Rueben.

Rebecca testified that she and her husband have a minor interest in CGPS. She said that she has not invested any money or made a capital contribution in CGPS. They did not ask Rebecca for money or property when they started CGPS, she guessed her knowledge was her contribution, and they simply told her they would make her a member. She confirmed that her name was on CGPS's Certificate of Formation.

<u>Other Witnesses</u>

Rueben called several non-party witnesses who had business experience with CS to testify. The first witness, Raul Martinez, testified that Chaffin and Rueben told him they were business partners, and they were fifty-fifty partners. CS performed electrical work for some of the residential projects Martinez worked on.

Rueben next called Jessica Place to testify regarding work CS did for her landscaping company beginning in 2018. Place said that during her first meeting with Chaffin, Rueben described him as his business partner with CS.

Brian Gesner owns an HVAC company that had done work with CS and testified at the hearing. Gesner first met Chaffin through Rueben on a jobsite, and he met Zurovec at a networking function. When asked what Chaffin told him about CS, Gesner said they represented themselves as a company that had just formed. Chaffin and Rueben presented themselves as partners and specifically used the word "partners." Gesner's company has worked with CS on probably ten different jobs.

Michael Rosenhahn, a master electrician who had done work for CS, also testified for Rueben. He said he was the original master electrician for CS, and his job was to pull permits. He was introduced to CS through Rueben in 2019 and worked for CS on a weekly basis. CS needed a master electrician to pull permits, and Rueben was a journeyman electrician. When Rosenhahn hired on, Zurovec, Chaffin, and Rueben said they were the owners.

Vazquez also testified. For the 2021 workers' compensation policy, Zurovec and Rueben were the excluded members, and the reason for exclusion on the policy would be that they are owners. Vazquez testified that the information to exclude Zurovec and Rueben on the policy came from Zurovec. Vazquez testified she understood Rueben to be an owner, which Zurovec told her on the phone and in person. Vazquez described a meeting she had with Zurovec, Chaffin, and Rueben in May 2021, where Chaffin explained he was in sales and not really an owner, but Zurovec and Rueben were recognized as CS's owners. She knew CS was an LLC but had not seen the company's registration documents. She was unaware that Zurovec was the sole member and manager until she received a subpoena to testify. A January 2021 email Zurovec sent indicated they should include Rueben as an officer.

Additional Evidence

Multiple exhibits were admitted during the hearing. These included Certificates of Formation for CS and CGPS. The CS Certificate of Formation showed Zurovec as the sole managing member, while the Certificate of Formation for CGPS listed multiple members. CS's Company Agreement listing Zurovec as the sole member was also admitted. A copy of a check written to Rueben from CS and signed by Zurovec with the memo noting partial return on investment was

16

admitted. Copies of Zurovec's K-1, Rueben's 2019 1099 from CS, and Rueben's 2020 W-2 from CS were also admitted.

Spreadsheets showing a materials list with prices of items transferred from CS to CGPS that Rueben prepared were admitted over Appellants' objection. An additional spreadsheet showing various real properties was also admitted that included the properties Rueben claimed he owned an interest in.

## D. Trial Court's Findings and Temporary Injunction

The trial court granted Rueben's request for a temporary injunction. The trial court found that "Rueben has a valid cause of action against Defendants, that he has a probable right of recovery on his cause of action, and that he faces a probable, imminent and irreparable harm in the absence of this Temporary Injunction." The trial court further found that

> Plaintiff and Defendants Zurovec and Chaffin agreed to be partners, members, and/or co-owners of a business (Collaborative Services); that Plaintiff invested over $100,000 into said business, and in return for said contributions, Defendants Zurovec and Chaffin agreed pay Defendant 50% of profits of the business. Defendant Chaffin held Plaintiff out as a co-owner/partner to various prospective clients. Defendant Zurovec held Plaintiff out as co-owner to insurance agent Vasquez, as demonstrated by Defendant Zurovec's excluding workers compensation for Plaintiff. Defendants have forced out Plaintiff while creating a new competing business, Defendant Collaborative Generators and Power Solutions, where Defendants have made numerous transactions benefiting Collaborative Generators while Defendant Collaborative Services took a loss.

The trial court enjoined Appellants from

> A. Selling, disposing of, transferring, or encumbering any inventory, property or assets of [CS] to or for the benefit of [CGPS], including, but not limited to, generators currently in stock and on order, cash, bank accounts, accounts receivable, contracts for current or future work, vehicles, trailers, forklifts, tools and supplies, and real property. For the sake of clarity, this Temporary Injunction is not intended to restrain Collaborative Services from engaging in its day-to-day business operations;
> B. Selling disposing of, transferring or encumbering any property owned by Plaintiff currently in Defendants' possession.

The trial court set a $5,000 bond and set the matter for trial in September 2022.

Zurovec, Chaffin, and CS timely appealed.

### Standard of Review

"A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citations omitted). To obtain a temporary injunction, an applicant must show: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.*; *see also Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020). The temporary injunction applicant bears the burden of production to offer some evidence establishing a probable right to recovery. *In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (quoting *Camp v. Shannon*, 348 S.W.2d 517, 519 (Tex. 1961)); *Dall. Anesthesiology Assocs., P.A. v. Tex. Anesthesia Grp., P.A.*, 190 S.W.3d

18

891, 896–97 (Tex. App.—Dallas 2006, no pet.). The applicant need not establish that it ultimately will prevail at trial, only that it is entitled to preservation of the status quo pending trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Dall. Anesthesiology Assocs.*, 190 S.W.3d at 897.

The decision to grant or deny a temporary injunction rests within the trial court's sound discretion. *Butnaru*, 84 S.W.3d at 204. We review the evidence submitted to the trial court in the light most favorable to its ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court a resolution of conflicting evidence. *CRC-Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 262 (Tex. App.—Houston [1st Dist.] 1996, no writ). Our review of the trial court's decision is limited to the validity of its temporary injunction order; we do not consider the merits of the underlying case. *Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex. 1978); *see also Henry v. Cox*, 520 S.W.3d 28, 33–34 (Tex. 2017). However, a temporary injunction will be dissolved if it is based on an erroneous application of the law to the facts. *See Dall. Gen. Drivers, Warehousemen & Helpers v. Wamix, Inc., of Dall.*, 295 S.W.2d 873, 879 (Tex. 1956). If some evidence reasonably supports the trial court's decision, the trial court does not abuse its discretion. *Butnaru*, 84 S.W.3d at 211. "An abuse of discretion does not exist where the trial court bases its decisions on conflicting evidence." *Davis*, 571 S.W.2d at 862. An applicant need only plead and present evidence to support one cause of

action to establish a probable right of recovery. *See Am. Med. Home Health Servs., LLC v. Legacy Home Health Agency, Inc.*, No. 04-20-00494-CV, 2022 WL 946521, at *6 n.5 (Tex. App.—San Antonio Mar. 30, 2022, no pet.) (mem. op.).

## III. Analysis

### A. Standing

In their sixth issue, Appellants argue that Rueben lacks standing to sue for harm allegedly incurred by CS. "Because lack of standing deprives the court of subject-matter jurisdiction, we address this issue first." *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 479 (Tex. 2017); *see also Abbott*, 610 S.W.3d at 917. "In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154 (Tex. 2012).

Rueben did not sue to recover on behalf of CS, rather he sued CS. Rueben alleged that he has an ownership interest in CS, the parties agreed to split profits, and Zurovec, Chaffin, and others created another entity and began transferring assets from CS to that entity at a loss. He sought damages in the form of his share of CS's profits, inventory, his unreimbursed contributions for the capitalization of CS, and his share of the proceeds from properties that were sold, among other things. These are injuries he alleges he incurred due to Appellants' actions, which shows a real

20

controversy between the parties exists and will be resolved by the court. *See id.* We overrule this issue.

## B. Probable Right to Recovery: Issues One and Two

Of the three requisite elements for a temporary injunction, Appellants challenge the second two, arguing that Rueben failed to establish his probable right to recovery and that imminent and irreparable harm would occur in the absence of a temporary injunction. *See Abbott*, 610 S.W.3d at 916. In their first two issues, Appellants contend the trial court abused its discretion by issuing a temporary injunction 1) where Rueben failed to demonstrate there was a meeting of the minds on essential terms necessary to create a valid contract and 2) finding there was a contract regarding CS, because Rueben failed to produce a written contract as required by the Texas Business Organizations Code. Rueben counters that these issues improperly seek an advanced determination on the merits of the underlying claims.

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru*, 84 S.W.3d at 204. We do not delve into the case's merits in determining whether there is a probable right to recovery. *See Henry*, 520 S.W.3d at 33–34; *Davis*, 571 S.W.2d at 861–62. Whether Appellants can defeat the existence of the alleged agreements is at the heart of this case as they have pleaded and presented evidence challenging them. Their

ultimate success or failure is a decision for the factfinder, not this court. *See GTE Mobilnet of S. Tex. Ltd. P'ship v. Cellular Max, Inc.*, 123 S.W.3d 801, 803 (Tex. App.—Beaumont 2003, pet. dism'd) (reasoning that in the context of an arbitration, the defendant's defeat of a contract and "ultimate success or failure is a decision for the arbitrator, not this court[]").

Appellants point to factors courts weigh in determining the existence of an implied partnership and assert that Ruben did not meet these factors. The five factors courts consider for an implied partnership are: (1) the receipt or right to receive a share of the profits; (2) the expression of an intent to be partners; (3) the right to participate in control of the business; (4) an agreement to share losses or liabilities, and (5) an agreement to contribute money or property to the business. *See* Tex. Bus. Orgs. Code Ann. § 152.052(a); *Ingram v. Deere*, 288 S.W.3d 886, 894 (Tex. 2009).

Here, Rueben testified that he, Zurovec and Chaffin agreed to start a business in late 2018, and that they agreed he would own fifty percent of the business. By early 2019, Zurovec admitted she had filed dba paperwork for CS. Zurovec, Chaffin, and Rueben all testified that Ruben started working at CS soon after. Multiple non-party witnesses testified that Zurovec, Chaffin, and Ruben held themselves out as partners, and one witness, Rosenhahn, testified the three represented themselves as co-owners. Additionally, their insurance agent, Vazquez, testified Zurovec excluded Rueben from workers' compensation coverage because he was an owner. Rueben

testified he had authority to hire and fire employees, even though Zurovec disputed his testimony.

After operating for almost a year, Zurovec filed a Certificate of Formation turning CS into an LLC. Rueben testified he only learned of this after the fact and tried to address it immediately by hiring a lawyer. All three parties agreed that Rueben provided capital for CS, although they disputed whether these monetary contributions were loans or investments. Despite Zurovec and Chaffin's contentions that these were loans rather than investments, Rueben provided documentary evidence of a check written by CS and signed by Zurovec with a memo noting it was a partial return on investment. Rueben also provided testimony that after Chaffin advised him they were going to part ways, Chaffin told him they would go through everything and split it fifty-fifty.

While the parties presented conflicting evidence regarding the existence of an oral agreement, a trial court does not abuse its discretion by basing its decision on conflicting evidence. *See Davis*, 571 S.W.2d at 862. Viewing the evidence in the light most favorable to the trial court's ruling and deferring to its resolution of conflicting evidence, we hold the trial court did not abuse its discretion by determining the parties had an agreement to be partners or share an ownership interest in CS. *See CRC-Evans Pipeline Int'l, Inc.*, 927 S.W.2d at 262. We overrule issue one.

In its second issue, Appellants contend that the trial court abused its discretion in determining there was a contract pertaining to CS as required by the Texas Business Organizations Code. Although Appellants dispute this evidence, at least some evidence existed that the parties entered into an agreement in late 2018 and CS began operating in early 2019 as a dba. *See Henry*, 520 S.W.3d at 34; *Davis*, 571 S.W.2d at 862. In support of this argument Appellants rely heavily on the *Sohani* case. *See Sohani v. Sunesara*, 546 S.W.3d 393 (Tex. App.—Houston [1st Dist.] 2018, no pet.). However, we find that case distinguishable as it involved a jury verdict on the case's merits rather than the review of a temporary injunction. *See id.* at 396. In reviewing a temporary injunction, we do not delve into the case's merits. *See Henry*, 520 S.W.3d at 33–34; *Davis*, 571 S.W.2d at 861–62.

Zurovec testified that she did not convert CS to an LLC until October 2019, and by then, CS had been operating for almost a year. Further, Rueben testified that when Zurovec filed the LLC Certificate of Formation naming her as the sole member, they did not apprise him of this information. For these reasons and those outlined in issue one, we conclude the trial court did not abuse its discretion in determining an agreement existed despite the absence of a written contract. We overrule issue two.

**C. Imminent and Irreparable Harm: Issue Three**

In their third issue, Appellants argue the trial court abused its discretion by finding Rueben faces imminent and irreparable harm in the absence of an injunction, as he only alleged monetary damages. Appellants correctly note that a plaintiff must plead and prove they will suffer an imminent and irreparable harm for which there is no adequate remedy at law. *See* Tex. R. Civ. P. 680; *Butnaru*, 84 S.W.3d at 204 (listing elements of injunction including imminent, irreparable injury). "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Courts generally will not enforce a contract with a temporary injunction, because the damages are monetary. *See id.* at 211. However, as our sister court in Texarkana has explained, "[E]ven if damages are subject to a precise calculation, an injunction will lie to prevent the dissipation of specific funds that would otherwise be available to pay a judgment." *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 764 (Tex. App.—Texarkana 2017, pet. dism'd) (citation omitted).

Here, in addition to a breach of contract cause of action, Rueben asserted claims for breach of fiduciary duty and fraud. There was some evidence presented at the temporary injunction hearing which established that: (1) Zurovec and Chaffin "parted ways" with Rueben; (2) Zurovec, Chaffin, and others formed a new entity CGPS engaged in providing the same services as CS shortly after parting ways with

25

Rueben; (3) materials and inventory from CS were transferred to CGPS; (4) despite assurances that CGPS would pay for the materials and inventory, at the time of the hearing CGPS had not made any such payments to CS; (5) there were no terms for repayment between CGPS and CS for the materials; and (6) Rueben had provided capitalization to purchase some of the materials and inventory. Rueben also testified that Chaffin agreed they would go through the inventory and split it fifty-fifty and denied all he sought was money. Rather, he testified he wanted "what's mine."

Appellants focus on Rueben's claims that he was entitled to a share of the profits, and therefore monetary damages only. However, Rueben claimed an interest in the inventory, property, and tools, among other things. The evidence showed that there was not simply a fear that property would be transferred from CS to CGPS, but that substantial materials and inventory had already been transferred and CS had not been paid for that inventory. Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that it did not abuse its discretion in determining that Rueben met his burden of showing an imminent and irreparable injury in the absence of a temporary injunction. *See Henry*, 520 S.W.3d at 34; *Davis*, 571 S.W.2d at 862; *CRC-Evans Pipeline Int'l, Inc.*, 927 S.W.2d at 262; *see also Hartwell*, 528 S.W.3d at 764. We overrule issue three.

**D. Admission of Evidence: Issue Four**

Appellants next contend the trial court erred by admitting Rueben's Exhibit 6, and absent the erroneously admitted exhibit, there was no evidence of damages. Appellants argue that the spreadsheet compiled by Rueben that contained prices for materials and inventory CS purchased constituted hearsay and that he failed to produce the underlying information he used to create the spreadsheet at trial. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). To show a trial court abused its discretion by admitting evidence during a temporary injunction hearing, the complaining party must demonstrate that: "(1) the trial court erred in admitting the evidence; (2) the erroneously admitted evidence was controlling on a material issue of the case and was not cumulative; and (3) the error probably caused rendition of an improper judgment in the case." *Ron v. Ron*, 604 S.W.3d 559, 574 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citing Tex. R. App. P. 44.1(a)(1); *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 422 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (other citations omitted)). The complaining party has the burden to show harm from an erroneous evidentiary ruling. *Id.*

We disagree that there was no other evidence of damages. Rueben testified that CS transferred materials and inventory, including generators to CGPS at a loss.

27

Appellants themselves confirmed they had transferred materials from CS to CGPS, and although their intention was for CGPS to pay CS, Zurovec could not recall the repayment terms, and as of the temporary injunction hearing, CGPS had not paid CS for any of the materials or inventory. Moreover, Appellants agreed that Rueben provided monetary contributions to CS for the purchase of generators, among other things, and although the reasons for nonpayment were disputed, they had not paid all the money back.

Considering this other evidence, we cannot say that the admission of Rueben's Exhibit 6, even if erroneous, probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Ron*, 604 S.W.3d at 574. The trial court could have reasonably concluded that Rueben sustained damages based on the testimony an agreement existed that Rueben and Appellants would split profits, property, and inventory fifty-fifty, and he had not been paid for those things plus evidence he contributed capital to CS for the purchase of such items which admittedly had not been reimbursed in full. We overrule this issue.

## E. Vagueness of Injunction: Issue Five

In their last issue, Appellants contend the temporary injunction is impermissibly vague in violation of Texas Rule of Civil Procedure 683. They assert the temporary injunction fails to identify the property at issue with any specificity, which constituted an abuse of discretion. We agree.

28

Texas Rule of Civil Procedure 683 requires every order granting an injunction 1) set forth the reasons for its issuance, 2) be specific in terms, and 3) describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained. *See* Tex. R. Civ. P. 683. Rule 683's procedural requirements "are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved." *Qwest Commc'ns Corp. v. AT & T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000); *see also InterFirst Bank San Felipe, N.A. v. Paz Const. Co.*, 715 S.W.2d 640, 641 (Tex. 1986).

Paragraph 4B simply enjoins Appellants from "[s]elling[,] disposing of, transferring or encumbering any property owned by Plaintiff currently in Defendants' possession." The temporary injunction does not describe the property owned by Plaintiff in Defendants' possession. One cannot tell if it is real property, personal property, or both.

In his brief Rueben notes the language in his First Amended Petition which "refers to Appellee's personal property, *including but not limited to* a work van." (Emphasis added.) He further states that "property" as used in the temporary injunction does not include any claimed interest in real property "as the real properties are referenced separately throughout the Petition as the defined term 'Properties.'" Rueben asserts that "[w]ith this understanding, there is no basis for finding the TI vague."

29

However, Rule 683's express language requires a description in "reasonable detail" and "not by reference to the complaint or other document[.]" Tex. R. Civ. P. 683. Rueben's need to reference his First Amended Petition to clarify the property involved indicates the temporary injunction lacks the requisite specificity.[3] Enjoined parties should be able to review a temporary injunction order, understand it, and not guess about what they are prohibited from doing upon threat of contempt. *See TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 213 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("Requiring that an enjoined party search for evidence to understand what conduct is enjoined undermines the purposes of an injunction, which are to remedy specific harm and to provide notice of the prohibited conduct."). Given the broad ownership interests Rueben claims and Appellants' steadfast denials of the same, delineating the property and its character with some degree of specificity is necessary. We hold the temporary injunction's phrase "any property owned by Plaintiff in Defendants' possession" is impermissibly vague because it fails to provide adequate notice to Appellants of the specific acts they are enjoined from performing in terms not subject to reasonable disagreement. *See TMRJ Holdings*, 540 S.W.3d at 214 (concluding injunction was impermissibly vague

---

[3]Even if Rule 683 allowed us to reference outside documents like Rueben's complaint, which it does not, we note that the First Amended Petition does not limit the type of property involved, as shown by use of the phrase "including but not limited to[.]"

where it failed to adequately identify acts that it restrained); *Cooper Valves, LLC v. ValvTechnologies, Inc.*, 531 S.W.3d 254, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting injunction "should inform a party of the acts he is restrained from doing without requiring inferences or conclusions about which persons might disagree and which might require additional court hearings"); *Austin Housing Fin. Corp. v. Friends of Brykerwoods LLC*, No. 01-20-00314-CV, 2021 WL 2369502, at *6 (Tex. App.—Houston [1st Dist.] June 10, 2021, no pet.) (mem. op.) (concluding temporary injunction's prohibition of "any construction activities" was too vague as it failed to provide adequate notice of restrained activities in terms "not subject to reasonable disagreement"); *Dickerson v. Acadian Cypress & Hardwoods, Inc.*, No. 09-13-00299-CV, 2014 WL 1400659, at *7 (Tex. App.—Beaumont Apr. 10, 2014, no pet.) (mem. op.) (concluding temporary injunction violated Rule 683 as it failed to adequately define the "current clients" restrained party could not contact); *In re Krueger*, No. 03-12-00838-CV, 2013 WL 2157765, at *6 (Tex. App.—Austin May 16, 2013, no pet.) (mem. op.) (concluding injunction did not comply with Rule 683 where it failed to provide specific bank account names and numbers relator was enjoined from accessing). We sustain this issue.

## IV. Conclusion

We conclude the trial court did not abuse its discretion in determining that Rueben was entitled to a temporary injunction preserving the status quo. However,

31

because the trial court's order fails to comply with Rule 683's mandatory requirements, we declare the temporary injunction order void, dissolve the injunction, and remand the case to the trial court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on June 16, 2022
Opinion Delivered August 25, 2022

Before Golemon, C.J., Kreger and Horton, JJ.